**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JACKIE HAGERTY, Next Friend for
PH, a minor, and
JACKIE HAGERTY and PATRICK HURST, individually,

      Plaintiffs,                   Case No.

vs.                                U.S. District Judge
                                 U.S. Magistrate Judge

BATH COMMUNITY SCHOOL
DISTRICT, LORENDA JONAS,
TEACHER/SUPERVISOR #1,
TEACHER/SUPERVISOR #2,
LD, JR., LUCAS X. DILLON, SR. and
RENEE E. DILLON., in their individual
capacities, and CHRIS HODGES, in his
official capacity.

      Defendants.
_____/

## COMPLAINT FOR EQUITABLE AND INJUNCTIVE RELIEF AND DAMAGES

NOW COME Plaintiffs, JACKIE HAGERTY, as Next Friend of PH, a minor, JACKIE

HAGERTY and PATRICK HURST, individually, by and through their attorneys, THE LEX

FIRM, P.C., and state the following for their Complaint against the Defendants:

### JURISDICTION AND VENUE

1.     This cause of action arises under the U.S. Constitution and the laws of the United

States, including the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. §§ 1983, and

under the constitution, statutes and common law of the State of Michigan.

2.     This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§

1331, 1343 and 42 U.S.C. §1983.

3.      This Court should exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because those claims arise out of the same facts as the federal claims and all claims are part of the same case or controversy.

4.      Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. §1391(b)(1)-(2) because all facts alleged in this Complaint occurred in Clinton County, Michigan and all parties reside within the Eastern District of Michigan.

## THE PARTIES

### PLAINTIFFS

5.      At all times relevant to this lawsuit, Paige Hurst ("PH"), a minor, lived with parents JACKIE HAGERTY and/or PATRICK HURST, in the County of Clinton, State of Michigan.

6.      That the Plaintiff, JACKIE HAGERTY is the mother and will be the duly appointed next of friend of, PH, a minor.

7.      That Plaintiffs JACKIE HAGERTY and PATRICK HURST, individually, reside in the County of Clinton, State of Michigan.

### THE BATH DEFENDANTS

8.      Defendant Bath Community School District ("BCSD") is a municipal corporation organized and carrying out its functions in the Township of Bath, County of Clinton, State of Michigan. BCSD's functions include all operations at Bath Middle School, including but not limited to funding, staffing, training, supervising the staff, counselors, and teachers at Bath Middle School, and maintaining the safety and security of school facilitates for the education and general welfare of BCSD students.

9.      BCSD is being sued pursuant to 42 U.S.C. § 1983 for its official policies, practices, and customs, which were the motivating force and cause-in-fact for the decision to return and/or

permit Defendant Lucas Dillon, Jr. ("LD, Jr.") to engage in school and school activities, like field day, with other students without proper supervision and/or without proper restrictions, as it did on June 4, 2024.

10.     Further, BCSD is being sued pursuant to 42 U.S.C. § 1983 for its official policies, practices, and customs, which were the motivating force and cause-in-fact for the decision to return and/or permit Defendant Lucas Dillon, Jr. ("LD, Jr.") and/or other students to bully other students, including but not limited to attacking PH.

11.     Further, BCSD is being sued pursuant to 42 U.S.C. § 1983 for its official policies, practices, and customs, which were the motivating force and cause-in-fact for employees, agents, students and parents failing to complete a concussion awareness training/education program prior to school activities, including but not limited to field day.  BCSD is required to provide educational materials on the symptoms and consequences of concussions to employees, agents, students  and/or parents/guardians.

12.     Further, BCSD is being sued pursuant to 42 U.S.C. § 1983 for its official policies, practices, and customs, which were the motivating force and cause-in-fact for employees and/or agents failing to notify PH's parents of what transpired to PH so that they were informed of and were permitted to direct PH's medical treatment, per their constitutional right.

13.     Upon information and belief, Defendant Lorenda Jonas ("Jonas") is a citizen of the State of Michigan and at all relevant times was acting under the color of state law within the course and scope of her employment as Principal of Bath Middle School within Defendant BCSD.  Jonas is being sued pursuant to 42 U.S.C. § 1983, and for her gross negligence under state law.

14.     Defendant Teacher/Supervisor #1 is a citizen of the State of Michigan and at all relevant times was acting under the color of state law within the course and scope of his/her

employment as a teacher/supervisor at Bath Middle School within Defendant BCSD.  Teacher #1 is being sued pursuant to 42 U.S.C. § 1983, and for his/her gross negligence under state law.

15.     Defendant Teacher/Supervisor #2 is a citizen of the State of Michigan and at all relevant times was acting under the color of state law within the course and scope of his/her employment as a teacher/supervisor at Bath Middle School within Defendant BCSD.  Teacher #2 is being sued pursuant to 42 U.S.C. § 1983, and for his/her gross negligence under state law.

16.     Upon information and belief, at all relevant times hereto, Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other currently unidentified school officials were employees or actual and/or apparent agents of BCSD, working in their course and scope of employment and/or agency at BCSD.

17.     At all relevant times hereto, Defendants Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other currently unidentified school officials, whose names are unknown to the Plaintiffs as of the filing of this complaint, had direct contact with the attacker, LD, Jr. when LD, Jr. violated the law by attacking PH, other students and/or teachers and/or were acting as field day supervisors at BCSD, within the course and scope of their employment with BCSD.  BCSD is vicariously liable for the negligence and gross negligence of the aforementioned Defendants.

18.     At all relevant times hereto, Defendants Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other currently unidentified school officials, whose names are unknown to the Plaintiffs as of the filing of this complaint, had direct contact with and were in control of PH, after JD, Jr.'s attack and/or were acting as employees, representative and/or agents at BCSD, within the course and scope of their employment with BCSD.  BCSD is vicariously liable

19.     BCSD, Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other currently unidentified school officials are referred to collectively as "the Bath Defendants".

20.     Upon information and belief, Defendant Chris Hodges ("Hodges") is a citizen of the State of Michigan and is currently the Superintendent of BCSD. Hodges has been named in this Complaint in his official capacity only and is not included within "the Bath Defendants" who are being sued for damages. Hodges is being sued pursuant to 42 U.S.C. § 1983 for prospective equitable and injunctive relief because he is the highest-ranking official of BCSD and is responsible for ensuring the District's compliance with state and federal laws, including the Fourteenth Amendment's Due Process Clause.

### THE DILLON DEFENDANTS

21.     At all times relevant to this lawsuit, Defendant LD, Jr., a minor, was the perpetrator of the assault committed on June 4, 2024, at Bath Middle School, and lived with his parents in the Township of Bath, County of Clinton, State of Michigan.

22.     At all times relevant to his lawsuit, Defendant Lucas X. Dillon, Sr. ("LD, Sr.") was the father of LD, Jr., who lived with his parents in the Township of Bath, County of Clinton, State of Michigan.

23.     At all times relevant to his lawsuit, Defendant Renee E. Dillon ("RD") was the mother of LD, Jr., who lived with his parents in the Township of Bath, County of Clinton, State of Michigan.

24.     LD, Jr., LD, Sr. and RD are sometimes referred to collectively as "the Dillon Defendants."

### COMMON ALLEGATIONS

25.     Upon information and belief, over the course of his school years with BCSD, LD, Jr. and other students, exhibited repeated, concerning, strange, bizarre, abusive and/or violent behavior, including but not limited to bullying and/or assaulting students multiple times before the underlying incident that is subject to this lawsuit.

26.     Upon information and belief, in the months leading up to the attack that is subject to this lawsuit, JD, Jr. and/or other students were known to Bath Middle School and BCSD teachers, counselors, and/or administrators for his/her/their concerning behavior that indicated emotional distress and the possibility of child neglect.

27.     In the weeks and/or months leading up to the underlying assault, JD, Jr. and/or other students assaulted the child of Melissa Harmon, multiple times.  This is one other child known to the BCSD.

28.     At minimum, on or about June 4, 2024, after LD, Jr.'s and/or the other student's attack on the child of Melissa Harmon, his/her mother went so far as to issue a public statement on the BCSD's Facebook page and made it known of such repeated incidents.[1]

29.     In response to these incidents reported from parents, students and/or teachers, District administrators persisted in their campaign to conceal and minimize the threat to students' safety.  Essentially, either the District did not have an anti-bullying policy or it certainly was not implemented at Bath Middle School.

30.     After each one of the past incidents, as mentioned herein, Jonas and other school officials permitted JD, Jr. and/or other students to participate in and/or return to class and/or school activities, such as field day, without proper supervision or restriction.

---

[1] Exhibit 1; The Harmons were forced to remove their children from BCSD in favor of home schooling because of the severe bullying

31.    Additionally, upon information and belief, the above conduct should have alerted JD, Jr.'s parents, as well as other people who had extensive contact with him and/or the other students, that he/she/they were suffering from significant emotional and/or behavioral problems, and that he/she/they might have been subject to child neglect by his/her/their parents.

32.    Upon information and belief, despite these concerning and reoccurring events, neither LD, Sr. or RD did anything to get an assessment of LD, Jr.'s behavioral condition.

33.    Clearly, this behavior was known or would have been known to his parents.

34.    Upon information and belief, despite all of these concerning and reoccurring attacks, and others, which should have alerted LD, Sr. and RD to the fact that their son was engaged in some concerning, bullying behavior, and needed an immediate evaluation and treatment, the Dillon parents failed to obtain help for LD, Jr.  Their failure/refusal to get help for LD, Jr. was significant that it rose to the level of child neglect.

35.    Despite all of these concerning and reoccurring events, JD, Jr. and/or the other students were permitted to participate in and/or return to school without restrictions, participate in all activities, like field day, and interact with all other students without proper supervision or parameters in place.

36.    Jonas and other BCSD employees and/or agents made the deliberate decision to allow and/or return JD, Jr. and/or the other students to the classroom and other school activities, including field day, despite knowing their bullying and harmful behavior.

37.    Jonas and other BCSD employees and/or agents knew or should have known that telegraphing to LD, Jr. and/or the other students that there would be no meaningful disciplinary or other response to signals of violent/bullying intent would increase the risk of harm to all members

of the student body, including PH, by emboldening LD, Jr. and/or the other students to believe that they could successfully complete their attacks without meaningful intervention.

38.    Upon information and belief, Jonas and other BCSD employees and/or agents engaged in other conduct which emboldened, motivated and/or otherwise influenced LD, Jr. and/or the other students in a manner which made it more likely that additional attacks would occur.

39.    Jonas and other BCSD employees and/or agents had the authority as school administrators to maintain LD, Jr. and/or other students in a safe, secure and restricted environment, where, they could have been supervised appropriately by adults and not cause harm to other students.

40.    Instead, Jonas and other BCSD employees and/or agents exercised their authority to allow and/or return LD, Jr. and/or other students to class and other school activities, despite knowing that they posed a substantial threat to others.

41.    Jonas and other BCSD employees and/or agents misused their authority by sending LD, Jr. and/or other students to school activities without proper supervision and/or restriction.

42.    Jonas and other BCSD employees and/or agents had the official authority to act as "gatekeepers" in deciding whether to allow and/or return LD, Jr. and/or other students to the classroom and other school activities.

43.    Jonas and other BCSD employees and/or agents used their authority to allow and/or return LD, Jr. and/or other students to the classroom and other school activities, causing a departure from the status quo, and thus creating and/or exacerbating a risk of violence that had not existed or was lower when LD, Jr. and/or other students were safely secured, supervised and/or restricted.

44.    These affirmative acts by Jonas and other BCSD employees and/or agents, which departed from the status quo of safety, rendered the occupants of Bath Middle School, including

PH, more vulnerable to danger than had Jonas and other BCSD employees and/or agents not permitted and/or returned LD, Jr. and/or other students to the classroom and school activities.

45.     Upon information and belief, Jonas and other BCSD employees and/or agents engaged in other conduct which emboldened, motivated and/or otherwise influenced LD, Jr. and/or other students in a manner which made it more likely that another attack would occur.

46.     The affirmative action of Jonas and other BCSD employees and/or agents to allow LD, Jr. and/or other students to school placed the students at Bath Middle School  directly in harm's way.

47.     By permitting LD, Jr. and/or other students to participate in field days with the general school population, Jonas and other BCSD employees and/or agents affirmatively set into motion the sequence of events that lead to the attack on PH, with deliberate indifference to the substantial and obvious threat of school abuse and/or violence, and with recklessness demonstrating deliberate indifference and a substantial lack of concern for whether an injury resulted, either to PH or to the students of Bath Middle School.

48.     It is shocking to the conscience that Jonas and other BCSD employees and/or agents would take these actions despite their knowledge that LD, Jr. and/or the other students bullied and/or attacked other students in the past.

49.     By reason of the knowledge that the Bath Defendants possessed before the attack on June 4, 2024, it was foreseeable by said Defendants that LD, Jr. would carry out acts of violence on PH and possibly others at Bath Middle School during field day activities.

50.     The Defendants' affirmative actions were reckless, grossly negligent, shocked the conscience and put PH, and others, at substantial risk of serious and immediate harm.

51.     The severe and grievous injuries to PH were caused by the wrongful affirmative acts and fault of the Defendants being sued for damages.

52.     The Defendants knew that their actions would endanger the lives of Bath Middle School students, including PH on June 4, 2024.

53.     The BCSD and its administrators have been engaged in a concerted effort to deflect their responsibility for the continuous and systematic attacks by LD, Jr. and/or the other students at Bath Middle School.

54.     Defendant BCSD and its administrators adopted, implemented and followed an unconstitutional policy that resulted in permitting LD, Jr. and/or the other students to participate in field day and other school activities, despite knowing their bullying characteristics and their determination to be a threat to others.

55.     Specifically, upon information and belief, the BCSD has sought to avoid accountability by claiming it has a formal policy and practice of permitting students to participate in a school activity unless there is a "disciplinary" issue that can be used to either send them home, and since LD, Jr. did not present a "disciplinary" issue, it had no choice but to permit him to class and other school activities.

56.     This policy of using false justifications demonstrates egregious deliberate indifference to the danger presented when a student such as LD, Jr., is permitted to participate in the school environment without supervision, restriction and/or discipline.

57.     This unconstitutional policy relied upon by the Bath Defendants directly resulted in the harm to PH and is a basis for direct liability against BCSD.

58.     In fact, in order to protect the bodily integrity of the student body as a whole, and PH in particular, the BCSD policy should have required the detention, removal, restriction and/or

supervision from the student body of any student who was deemed to be in a mental health crisis or in any way posed a threat to the students of Bath Middle School.

59.    The policy should have required that in the event BCSD officials determined or believed that a student might pose a threat to others, an investigation should have been conducted.

60.    Discovery may reveal additional aspects of the policy that needed to be reformed or that needed to be added to the policy.

61.    The failure to keep JD,, Jr. supervised, segregated and/or away from other students was an essential factor in allowing JD,, Jr. to carry out his assault against PH.

62.    In fact, upon information and belief, the Bath Defendants knew that JD,, Jr. and/or the other students needed intervention, education, discipline and/or evaluation.

63.    While at school, the Bath Defendants stood in loco parentis PH and owed her the obligation to protect her from foreseeable and known attacks from others.

64.    The acts of the Bath Defendants, as alleged in the foregoing allegations of this complaint, greatly increased the danger posed by LD, Jr. and rendered the environment for PH and other students less safe after their acts than before.

65.    That on June 4, 2024, the Plaintiff, PH, was a student at and on the Bath Middle School premises.

66.    LD, Jr., also a student at Bath Middle School, and one who is known to have violent and/or harmful tendencies, including prior bullying and/or physical attacks on other students, violently plowed into PH with his shoulder fracturing her nose and injuring her left side, causing PH to hit the ground at full speed; the damages are devastating. This attack happened during field day and on school grounds.

67.     By reason of the knowledge that the Bath Defendants possessed before the underling assault on PH, it was foreseeable by said Defendants that LD, Jr. would carry out further acts of bullying and/or violence on PH and others.

68.     That Defendants' affirmative actions and inactions were reckless and put PH at substantial risk of serious and immediate harm.

69.     That Defendants knew or clearly had to know that their actions would endanger PH at Bath Middle School.

70.     After the attack, the Bath Defendants' failures continued.

71.     Whether viewed through the traditional medical lens, policies excluding parents from decision-making are unconstitutional.  It should go without saying the public schools should never hide information from or lie to parents about their children.

72.     Schools are partners with parents in the child rearing process – not substitutes. "[T]he interest of parents in the care, custody, and control of their children [] is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court" *Trussel vs. Granville*, 530 U.S. 67, 65 (2000) (plurality).

73.     Children are "not the mere creature of the state." *Pierce vs. Sec'y of the Sisters of the Holy Name of Jesus & Mary*, 268 U.S.510, 535 (1925), and the "right []...to raise one's children has[s] been deemed 'essential' and one of the "'basic civil rights of man.'" *Stanley vs. Illinois*, 405 U.S. 645, 651 (1972).   These parental rights are rooted in the "historical[]...recognition that natural bonds of affection lead parents to act in the best interests of their children. *Parham vs. J.R.*, 442, U.S. 584, 602 (1979).

74.     Thus, "'[i]t is cardinal'" that "'the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state

can neither supply nor hinder.'" *Traxel*, 530 U.S. at 65-66 (quoting *Prince vs. Massachusetts*, 321 U.S. 158, 166 (1944) ). "This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition. *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972).

75.     Per Plaintiff Jackie Hagerty, the following disturbing details about this preventable tragedy are as follows:

> *I was not given any details when the school contacted me at 10:30 am other than Paige had a bloody nose and couldn't ride the bus home. Which was 25 minutes later. I was confused as bloody noses usually do not last that long. I asked the principal to call me back in 10 minutes to advise if the bleeding had stopped. During the second call I was advised, by the principal, that they pretty much had it under control but it hadn't stopped yet. She offered to transport her home in her personal vehicle. At which time I could hear Paige crying in the background. At this point I knew it was not just a bloody nose and asked to speak with my daughter. I was told, 'she's speaking with Mr. Harrelson right now'. I again requested to speak to my daughter. Paige was given the phone and she was barely able to speak to me, the principal stood right there, because she was crying so hard. I told her to hand the phone over and I advised I would be there in about 20 minutes. I should never have to request two times to speak to my child.*

> *Upon walking into the office, Paige was in the conference room and walked out into the office area with an ice pack on her nose. Her eyes and face were red from crying. I told her to move the ice pack and I instantly saw how her nose was swollen. I said that's not just a bloody nose. I was still not given any information as to the incident.*

> *As Paige and I were walking out to the vehicle she started telling me that 2 boys were running at her full force and the next thing she knew she was on the ground with a puddle of blood below her. She also stated that she was spitting because she thought her mouth was bleeding and a teacher had to tell her to stop, that it was her nose not her mouth. We started home and then Paige started holding her forehead saying, my head hurts so bad. She said the staff was trying to joke around with her to make her laugh but every time they did it just made her face and nose hurt more*

> *On the way home at about 1 pm, I called the school and still no details were given as to what happened.*

> *That afternoon I started receiving text messages and phone calls from other parents regarding what had happened and they were checking in on Paige. From these communications I was learning some of the details of the incident which was all relayed from their children and we were trying to piece together what actually happened. I should, nor any parent, should ever have to try and piece together what happened to their child where they are supposed to be safe at school.*

*Paige's Dad and I decided to meet with the Superintendent first thing Wednesday morning. At this meeting Chris advised us he knew there had been an incident but he didn't have any details either. We requested a timeline of events because we didn't even know how long she had been bleeding for or if she had lost consciousness. Was a concussion assessment done? Why was she moved when there was so much blood after a hit to the head? A parent cannot determine the correct course of treatment without all of the details. All of the actions or inactions that day put our daughter at risk and could be considered child endangerment and or neglect for her health and well-being. When there is an incident like this, one of the adults that were on scene should be the one to inform the parent, not another staff member that has no information and is clueless as to what is actually going on.*

*Chris stated he was going over to look at video footage and interview the adults that were there when the incident happened and would let us know of his findings. When he called, I think it was the next day, he gave us the basic information that he had found out.*

*On June 15th Paige had not had headaches for a couple of days and her pediatrician had said she should be doing some walking to build up her energy so she went to Saugatuck with her father and was walking around shopping. The next day she started suffering really bad headaches, dizziness and nausea. We waited until June 17th to see if it would pass with rest. It was manageable throughout the day but that evening she went to bed and within minutes of laying down she started experiencing really bad dizziness where the room was spinning. I took her to the emergency room where they performed the concussion assessment again and diagnosed her as No loss of consciousness, concussion. They referred her to the concussion clinic and neurology at MSU and sent her home.*

*June 19th, I called Chris and requested a copy of the accident report because she had an appointment with the concussion clinic on Friday at 9:30 am. I wanted to have all information possible for them. The incident report was received via email on Friday at 12:09 pm. The concussion clinic performed the concussion assessment again. They referred her to physical therapy.[2]*

*June 28th, Physical therapy intake. They performed multiple tests on Paige to determine what she needs help with. During one of the tests, the therapist advised that she has BPPV and explained that it is where the crystals in her inner ear are dislodged.*

*This happens when there has been a 'blow to the head'. Looking left, Paige's left eye shakes uncontrollably. While standing on a 3- or 4-inch piece of foam with her eyes closed she could not hold her balance. The therapist even moved closer to her in case she fell, she was swaying that badly. She stated that it was not a minor concussion that it was a major concussion.*

*July 2nd, Neurology appointment, he performed all of the concussion tests yet again. When I explained to him that urgent care had stated minor concussion due to no loss of consciousness he stated, 'there are no minor concussions. A concussion is a concussion no matter what'. He also stated that the 'school official should know that loss of*

---

[2] Exhibit 4 – E-mail from Chris Hodges; Exhibit 5 – Accident Report

*consciousness is NOT the only sign of a concussion and when she couldn't remember what happened, that should have been their first sign'.*

76. BCSD agents and/or representatives knew and/or should have known that any student who is observed to, or is suspected of, suffering a significant blow to the head, has fallen from any height, or collides hard with another person or object, may have sustained a concussion.

77. BCSD agents and/or representatives knew and/or should have known that symptoms of a concussion may appear immediately, may become evident in a few hours, or evolve and worsen over a few days.

78. BCSD agents and/or representatives knew and/or should have known that district staff members who observe a student who might have sustained a concussion, should have the student accompanied to the school nurse or seek appropriate medical treatment, based on what had happened.

79. BCSD has the obligation to promulgate and/or follow rules and/or regulations related to students who are injured at any district-sponsored event or related activity, including but not limited to sustaining a concussion, also known as a mild traumatic-brain injury.

80. All BCSD employees, agents, representatives, coaches, teaches, nurses and/or trainers must complete an approved course on concussion and/or concussion management.

## CAUSES OF ACTION AGAINST DEFENDANTS

### COUNT I
### State-Created Danger – *Monell* Liability under 42 U.S.C. § 1983
### *(Defendant Bath Community School District)*

81. Plaintiffs incorporate by reference all of the previous and subsequent paragraphs.

82. Defendant BCSD and its administrators and policy makers, including Principal Jonas, adopted and maintained official policies, practices, and customs that were the moving force behind, and cause-in-fact of, the school attack and the severe and grievous injuries to PH on June

4, 2024.  Further, Defendant BCSD interfered with Plaintiffs constitutional right to make informed decisions concerning the care, custody, control and medical care of PH, which delayed a proper medical diagnosis, care and treatment for PH, causing additional injuries.  These official policies, practices, and customs included and are not limited to:

    a.    An official policy, practice, and custom of preventing staff and administrators from maintaining administrative supervision over students and restricting students from participating in and/or returning to the classroom or other school activities, like field day, unless there is a "disciplinary issue" to justify doing so;

    b.    A policy, practice, or custom of concealment, misrepresentation, minimizing or avoidance discipline and non-escalation to higher authorities, including law enforcement, of suspected or known risks of school abuse and/or violence;

    c.    The BCSD did not train Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 to supervise, secure or hold a student, or to otherwise restrict a student from participating and/or returning to the classroom or other school activities, like field day, where the student presents a threat of harm to others, and where returning the student to the classroom/recess environment would create or increase the danger of abuse and/or violence;

    d.    A policy, practice, and custom of not training staff or administrators in the proper manner of interviewing and questioning a student who is known to be abusive and/or violent;

    e.    A policy, practice, and custom of not training staff or administrators in the proper methods for completing a risk assessment;

    f.    A policy, practice, and custom of not training staff or administrators in the proper methods for making sure parents/guardians have the informed decision concerning the care, custody, control and medical care of their children;

    g.    A policy, practice, and custom of not training staff or administrators in the proper methods for completing a concussion protocol/education/management;

    h.    A policy, practice, and custom of not training staff or administrators in the proper methods for immediately contacting the parents/guardians, if their child is injured, and relaying the entire story so the parent/guardian is aware of what happened to their child;

      i.      Disregarding and diverting student mental health crises if they do not fit within the BCSD's definition of a "disciplinary issue";

      j.      Declining to file mandatory reports of suspected child abuse or neglect in violation of MCL § 722.623(a);

      k.      Discouraging teachers, counselors, and administrators from reporting suspected child abuse or neglect, despite their status as mandatory reporters;

      l.      Requiring additional and unnecessary procedures in order to approve a teacher, counselor, or administrator's request to file a report of suspected child abuse or neglect, or to contact law enforcement regarding a threat of violence at school; and

      m.      Any other policy, practice, or custom that may become known through the course of this litigation.

83.    These policies, practices and customs caused employees to inflict constitutional harms by directly starting the sequence of events that led to the attack and injury to PH on June 4, 2024.  Thereafter, these policies, practices and customs caused employees to inflict constitutional harms by lying and interfering with the Plaintiffs' right to make an informed decision concerning the care, custody, control and medical care of PH, causing further damages.

84.    As a direct and proximate result of the BCSD policies, practices and customs which caused BCSD employees to inflict constitutional harms by directly allowing JD, Jr.'s violence to occur, PH suffered terror, shock, excruciating pain, suffering, fear, trauma, severe emotional distress and will incur future damages and the need for medical care.

85.    As a direct and proximate result of the BCSD policies, practices and customs which caused BCSD employees to inflict constitutional harms by lying and/or interfering with the Plaintiffs' right to make an informed decision concerning the care, custody, control and medical care of PH, causing further damages, PH suffered terror, shock, excruciating pain, suffering, fear, trauma, severe emotional distress and will incur future damages and the need for medical care.

### COUNT II

**State-Created Danger – Deliberate Indifference – 42 U.S.C. § 1983**
***(The Bath Defendants)***

86.    Plaintiffs incorporate by reference all of the previous and subsequent paragraphs.

87.    Plaintiffs are citizens of the United States and is entitled to the rights, privileges, and immunities accorded to all citizens of the State of Michigan and the United States, including the clearly established right to be free from danger created and/or increased by individual Defendants Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents.

88.    Any reasonable person would be aware of this clearly established constitutional right.

89.    Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents, with knowledge of this clearly established right, and acting in deliberate indifference, violated PH's right to be free from violence without due process, as secured by the Fourteenth Amendment's Due Process Clause, by taking affirmative acts under color of law to disrupt the status quo and create a danger of severe injury that did not exist in the status quo prior to those affirmative state actions, and by taking affirmative acts which caused severe injuries to PH, which would not have happened but-for-those affirmative state actions.

90.    At all relevant times, Defendants Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents were acting under the color of state law as employees of BCSD, a public school district, including and not limited to securing, supervising, advising, and directing the activities of LD, Jr. and/or other students; taking actions and making decisions regarding school practices and procedures, both formal and informal; and in their conduct as school administrators and teachers.

91.    Defendants Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents knew that there were threats and acts of bullying/violence that compromised student safety at Bath Middle School in the weeks and months leading up to the June 4, 2024 attack on PH, and that those threats and acts had not been formally and/or fully investigated and handled properly.

92.    Defendants Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents had the authority and obligation as school administrators, supervisors and agents to maintain school safety and to fully and completely investigate all bullying and/or violence in their District and all threats, implied or actual, to the safety of the District's students.

93.    The affirmative actions and conduct of Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents in the weeks leading up to the June 4, 2024 attack, which created and/or increased the risk of harm to PH in reckless disregard for his safety, non-exhaustively include:

    a.    Promoting a policy, practice, or custom of misrepresentation, minimizing or avoidance and non-escalation of suspected or known risks of school bullying and/or violence; and

    b.    Any and all additional breaches that created or increased the danger of violence at the school that may become known through the course of this litigation.

94.    The foregoing non-exhaustively described actions and conduct of the individual government Defendants was a proximate cause of the minor Plaintiff's injuries.

95.    At all relevant times, Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents' respective actions, by failing to act, essentially implying to each and every student, including PH, that there was no credible threat of further violence, demonstrated conduct so reckless as to demonstrate a substantial lack of concern for whether an injury resulted.

96.    At all relevant times, PH was safer before Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents respectively took action and advised each and every student, including PH, that there was no credible threat of future abuse and/or violence.   By virtue of Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents' actions and/or inactions, they substantially increased the harm to PH.

97.    Had Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents performed reasonably, LD, Jr. and/or other students would have been removed from school or segregated from the general population, and the assault on PH on June 4, 2024, would never have occurred and PH would not have sustained the severe and grievous injuries she did that day.

98.    Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents' affirmative acts created a state-created danger that substantially increased the special danger of harm to PH and other students at Bath Middle School, as distinguished from a risk that affects the public at large.

99.    The conduct of Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents was objectively unreasonable and performed knowingly, deliberately, and with deliberate indifference to the safety of PH, causing all Bath Middle School students and staff to be less safe than they were before their affirmative actions.

100.    But for the affirmative acts and inactions of Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents, PH would not have attacked and injured on June 4, 2024.

101.    Upon information and belief, Defendants Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents knew that LD. Jr. and/or other

students were in extreme emotional distress; that they presented a substantial risk of danger to others at the school; that there was sufficient cause to believe parents neglected them; and/or that they expressed and acted on specific abusive and/or violent intentions.

102.    Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents had the authority and obligation as school administrators, teachers, supervisors, officials to maintain the status quo, in which LD, Jr. was safe, supervised, secure and restricted on June 4, 2024, and where he was properly supervised by adults and could not harm others.

103.    Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents had the authority to maintain, supervise and/or restrict LD, Jr. and/or other students in a safe and secure location under the watchful eye of a responsible adult until such time as he was no longer a threat to his fellow students.

104.    Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents affirmatively misused their authority by permitting LD, Jr. and/or other students to class and/or school activities, like field day, the day of June 4, 2024, despite knowing that LD, Jr. and/or others posed a substantial threat to others in the middle school.

105.    Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents each took affirmative actions that individually, or in concert with one another, created and substantially increased the danger that LD's Jr's conduct would escalate to actual violence, thus causing severe and grievous injuries to PH.

106.    Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents took affirmative acts on June 4, 2024 that created or increased the risk of danger, including but not limited to:

   a.    Permitting LD, Jr. and/or other students to participate with the general school population, despite knowing that they were abusive and/or a threat to others;

   b.    Promoting a policy, practice, or custom of concealment, misrepresentation, minimizing or avoidance and non-escalation of suspected or known risks of school bullying and/or violence; and

   c.    Any and all additional affirmative acts that created or increased the danger of bullying and/or violence at the school that may become known throughout the course of this litigation.

107.    Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents' affirmative acts created and exacerbated a state-created danger that substantially increased the special danger of harm to PH and her classmates at the school, and in doing so knowingly and recklessly disregarded the substantial risk of danger that LD, Jr. and/or other students posed to others.

108.    The relationship between Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents, as school administrators and/or agents, and the students of Bath Middle School, including PH, was such that Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents knew that PH was a foreseeable victim of LD, Jr.'s and/or other students acts of bullying and/or violence following his release back to the general school population without supervision or restrictions.

109.    Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents are not entitled to qualified immunity because Plaintiff's right not to be severely attacked and injured by a fellow student who was permitted to participate in a safe environment into one in which harm was likely to occur was clearly established at the time of Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents' actions.

110.    The conduct of Defendants Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents was objectively unreasonable and performed knowingly,

deliberately and with deliberate indifference to the safety of PH and his fellow students, causing Bath Middle School students and staff to be less safe than they were before Defendants' affirmative actions.

111.    Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents knew that their conduct, which exacerbated the risk and ultimately caused a vicious attack, violated the clearly established rights of the students at Bath Middle School.

112.    Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents had ample time to deliberate and make an unhurried judgment about whether to permit LD, Jr. and/or other students to participate with the general school population.

113.    Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents consciously disregarded a substantial risk of serious harm by permitting LD, Jr. and/or other students to participate with the general school population.

114.    But for the affirmative acts of Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents to change the status quo by permitting LD, Jr. and/or other students to participate in school activities without proper supervision or restrictions, LD, Jr. would not have bullied, attacked or injured anyone at Bath Middle School, including PH, on June 4, 2024.

115.    Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents' actions affirmatively created new dangers that did not exist as long as LD, Jr. and/or other students remained properly supervised, restricted and separated from the general student population.

116.    It is shocking to the conscience that Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents would permit LD, Jr. and/or other

students to participate in the classroom or other school activities, like field day, where they knew

that LD, Jr. and/or other students had attacked students in the past, and they knew that they had an

obligation to keep LD, Jr. and/or other students away from the classroom/recess environment even

if the circumstances did not present a "disciplinary issue."

117.    In comparison with the public-at-large, as students at Bath Middle School, PH and

other potential students were specifically at risk and exposed to the dangers presented by the act

of permitting LD' Jr. and/or other students to participate with the general school population, where

he committed the attack on PH.

118.    Further, after the attack, as described herein, Jonas, Teacher/Supervisor #1,

Teacher/Supervisor #2 and/or other employees and/or agents, and acting in deliberate indifference

and created a state created danger by violating Plaintiffs' constitutional right to make informed

decisions concerning the care, custody, control and medical care of PH, by failing to timely notify

PH's parents or relaying what happened, as secured by the Fourteenth Amendment's Due Process

Clause, by taking affirmative acts under color of law to disrupt the status quo and create a danger

of severe injury that did not exist in the status quo prior to those affirmative state actions, and by

taking affirmative acts which caused severe injuries to PH, which would not have happened but-

for those affirmative state actions.

119.    As  a  direct  and  proximate  result  of  Jonas,  Teacher/Supervisor  #1,

Teacher/Supervisor #2 and/or other employees and/or agents' deliberate indifference, PH  suffered

terror, shock, excruciating pain, suffering, fear, trauma, severe emotional distress, and will incur

future damages and the need for medical care.

### COUNT III
### Violation of Article 1, §17 of the Michigan Constitution-Substantive Due Process – Bodily Integrity
### *(The Bath Defendants)*

120.    Plaintiffs incorporate by reference all of the previous and subsequent paragraphs.

121.    The Due Process Clause of the Michigan Constitution provides, in pertinent part, that "[n]o person shall…be deprived of life, liberty or property, without due process of law . . . " Const 1963, art 1, § 17.

122.    The due process guarantee of the Michigan Constitution is coextensive with its federal counterpart.  The doctrine of substantive due process protects enumerated fundamental rights and liberties under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and under Const 1963, art 1, § 17.

123.    The substantive component of due process encompasses, among other things, an individual's right to bodily integrity free from unjustifiable government interference.

124.    In a long line of cases, courts have held that, in addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Due Process Clause includes the right to bodily integrity.

125.    Plaintiffs enjoy the constitutionally protected Due Process right to be free from the invasion of bodily integrity through assault and battery under the Due Process Clause.

126.    The violation of the right to bodily integrity involves an egregious, nonconsensual entry into the body which was an exercise of power without any legitimate governmental objective.

127.    The United States Supreme Court and the Michigan appellate courts have recognized that no right is held more sacred, or is more carefully guarded, than the right of every individual to the possession and control of his or her own person, free from all interference of others, unless by clear and unquestionable authority of law.

128.    Any reasonable person would be aware of this clearly established right to bodily integrity.

129.    Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents, with knowledge of this clearly established right, and acting in deliberate indifference, violated PH's right to bodily integrity and to be free from violence without due process, as secured by the Fourteenth Amendment's Due Process Clause, by taking affirmative acts under color of law to disrupt the status quo and create a danger of severe injury that did not exist in the status quo prior to those affirmative state actions, and by taking affirmative acts which caused severe injuries to PH, which would not have happened but-for those affirmative state actions.

130.    At all relevant times, Defendants Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents were acting under the color of state law as employees of BCSD, a public school district, including and not limited to securing, supervising, advising, and directing the activities of LD, Jr., and/or other students; taking actions and making decisions regarding school practices and procedures, both formal and informal; and in their conduct as school administrators, teachers, counselors and agents.

131.    Defendants Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents knew that LD, Jr. and/or other students presented a substantial risk of danger to others at the school; that there was sufficient cause to believe their parents neglected him; and that he attacked students and a teacher in the past.

132.    Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents had the authority and obligation as school administrators and agents to maintain the status quo, in which LD, Jr. and/or other students were safe, supervised, secure and restricted on June 4, 2024, and where he was supervised by adults and could not harm others.

133.    Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents had the authority to maintain LD, Jr. and/or other students in a safe and secure location under the watchful eye of a responsible adult until such time as they were no longer a threat to their fellow students.

134.    Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents affirmatively misused their authority by permitting LD, Jr. and/or other students to participate in class and other school activities, like field day, despite knowing that LD, Jr. and/or other students posed a substantial threat to others in the middle school.

135.    Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents each took affirmative actions that individually, or in concert with one another, created the danger that LD, Jr.'s conduct would escalate to actual violence, thus causing severe and grievous injuries to PH.

136.    Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents took affirmative acts on June 4, 2024 that created the risk of danger to PH and other students at Bath Middle School, including but not limited to:

    a.    Releasing LD, Jr. and/or other student to the general school population, without proper supervision or restriction, despite knowing that LD, Jr., and/or other students attacked others in the past, or having probable cause to know, that they were a threat to the bodily integrity of others;

    b.    Any and all additional affirmative acts of deliberate indifference that would shock the conscience and create and/or increase the risk of danger of abuse and/or violence at the school that may become known throughout the course of this litigation.

137.    Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents' deliberate indifference to LD, Jr.'s and/or other students abusive past, to permit LD, Jr., and/or other students to participate with the general school population without proper

supervision or restriction, shocks the conscience and directly and proximately resulted in the assault on PH on June 4, 2024.

138.    The relationship between Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents, as school administrators and agents, and the students of Bath Middle School, including LD, Jr., was such that Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents knew that PH was a foreseeable victim of LD, Jr.'s acts of abuse and/or violence.

139.    Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents are not entitled to qualified immunity because they clearly released LD, Jr. and/or other students from a safe environment into one in which harm and violation of PH's Constitutional right of bodily integrity was foreseeable and likely to occur as a result of Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents' deliberate indifference.

140.    The affirmative actions of Defendants Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents shock the conscience and were performed knowingly and with deliberate indifference to the safety of PH and her fellow students.

141.    Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents knew that their conduct violated the clearly established rights of the students at Bath Middle School, including PH.

142.    Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents had ample time to deliberate and make an unhurried judgment about whether to release LD, Jr. and/or other students back to the general school population without proper restriction or supervision.

143.    But for the affirmative acts of Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents to change the status quo by permitting LD, Jr., and/or other students to participate freely in school activities, including recess, LD, Jr. would not have attacked and injured PH on June 4, 2024.

144.    It is shocking to the conscience that Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents would release LD, Jr., and/or other students back to the classroom and other school activities, without proper restriction or supervision, where they knew that LD, Jr. and/or other students attacked other students in the past.

145.    Defendant Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents' deliberate indifference resulted in a nonconsensual touching of Plaintiff's body in violation of the Michigan Constitution 1963, art 1, § 17.

146.    As a direct and proximate result of Jonas, Teacher/Supervisor #1, Teacher/Supervisor #2 and/or other employees and/or agents' deliberate indifference, PH's Constitutional right to bodily integrity was violated and he suffered terror, shock, excruciating pain, suffering, fear, trauma, severe emotional distress, and will incur future damages and the need for medical care.

**COUNT IV**
**Prospective Equitable and Injunctive Relief**
**14th Amendment Due Process and 42 U.S.C. § 1983**
**(*Defendant Hodges*)**

147.    Plaintiffs incorporate by reference all of the previous and subsequent paragraphs.

148.    The Fourteenth Amendment to the United States Constitution forbids state actors from depriving any person of life, liberty, or property without due process of law.

149.    Based on the provisions of Michigan law regarding public education, the students of BCSD, including PH, have a constitutionally protected right to a public education, which is protected as a property interest under the Due Process Clause of the Fourteenth Amendment.

150.    Defendants BCSD and Hodges must exercise their authority in the operations of the District consistent with constitutional safeguards.

151.    As alleged in this Complaint, the Bath Defendants took affirmative state actions that, in accordance with official District policy, created the danger of abuse and violence at Bath Middle School, and which in fact caused the assault at Bath Middle School on June 4, 2024.

152.    Since June 4, 2024, the District as well as Superintendent Hodges, have failed to remedy the unconstitutional policies and customs that caused the PH's damages to occur, and have therefore deprived the students, including PH, of the full and equal enjoyment of their property right to a public education.

153.    Yet, to date, the BCSD has not undertaken any measures to restore the property right of Bath Middle School students, including PH, to the full enjoyment of a public education at Bath Middle School.

154.    BCSD's failure to restore the full property interest of students to a public education include, and are not limited to:

   a.    After the assault, the BCSD promised it would complete a thorough and independent investigation to review its actions and the events leading to the assault. To date, BCSD has not completed the investigation it promised to its students and community.

   b.    BCSD maintains an unconstitutional policy of prohibiting administrators from holding students out of the classroom, even where there is probable cause to know that they pose a risk of harm to themselves and/or others, so long as the circumstances do not present a "disciplinary" issue. So long as this policy is maintained, the BCSD will continue to place students in the classroom and general population even where they pose a threat to themselves and/or others, as happened when LD, Jr. and/or other student were

released and permitted to participate in field day without proper supervision or restriction on June 4, 2024.

c.    BCSD maintains a policy of failing to train administrators that they can restrict abusive and/or violent students from returning to the classroom or school activity.

d.    BCSD maintains a policy of failing to train administrators in how to complete a thorough and effective risk assessment for violent and bullying students.

e.    Since the assault, BCSD has engaged in a concerted cover story of its actions leading to the assault.

f.    BCSD maintains a policy of failing to train agents and/or administrators with regard to concussion protocol.

g.    BCSD maintains a policy of failing to train agents and/or administrators to immediately contact parents/guardians after a child is hurt and to relay all known facts so the parents/guardians may make an informed decision concerning the care, custody, control and medical care of their children. that they

155.    To redress and remedy these unconstitutional practices, Plaintiffs request the following prospective equitable and injunctive relief:

a.    An order requiring BCSD and/or Superintendent Hodges to complete the independent investigation of the actions and events leading to the assault on June 4, 2024 and all other instances of known bullying.

b.    An order requiring BCSD and/or Superintendent Hodges to immediately cease its policy, practice, or custom of concealment, misrepresentation, minimizing or avoidance and non-escalation to higher authorities, including law enforcement, of suspected or known risks of school abuse and/or violence.

c.    An order requiring BCSD and/or Superintendent Hodges to immediately reform its policy of prohibiting administrators from holding students out of the classroom, even where there is probable cause to know that they pose a risk of harm to themselves and others, so long as the circumstances do not present a "disciplinary issue". So long as this policy is maintained, BCSD will continue to place violent students in the classroom even where they pose a threat to themselves and others, as happened when NM was permitted to participate with the general student population on March 14, 2022.

d.      An order requiring BCSD and/or Superintendent Hodges to secure proper training for administrators to understand that they can hold and/or restrict students, and not return them to class, if there is probable cause to believe that they are a threat of harm to themselves or others.

e.      An order requiring BCSD and/or Superintendent Hodges to secure proper training for administrators in how to conduct a proper risk assessment when students are violent or bully other students.

f.      An order requiring BCSD and/or Superintendent Hodges to secure proper training for administrators and other staff of concussion protocol and when to contact a parent/guardian after a student is injured and what to say.

g.      All other prospective equitable and injunctive relief the Court deems necessary to restore Plaintiff's property right to a full public education, as protected by the Due Process Clause of the Fourteenth Amendment.

## COUNT V
### Negligence and Gross Negligence
### *(The Bath Defendants)*

156.    Plaintiffs incorporate by reference all of the previous and subsequent paragraphs.

157.    On June 4, 2024, the minor Plaintiff, PH, was a student at Bath Middle School during the assault being carried out by Defendant LD, Jr.

158.    LD, Jr. violently plowed into PH with his shoulder fracturing her nose and injuring her left side, causing PH to hit the ground at full speed

159.    As a direct and proximate consequence of the experience of being viciously attacked by LD, Jr., PH has suffered physical pain, discomfort, severe anxiety and emotional distress, including but not limited to the following:

a.      Concussion without loss of consciousness;

b.      Broken bones;

c.      Nausea;

d.      Fatigue;

e.    Dizziness;

f.    Forgetfulness;

g.    Stuttering;

h.    Insomnia;

i.    Headache;

j.    Anxiety/Depression;

k.    Deficient smooth pursuit of eye movements;

l.    Fusion with defective stereopsis;

m.    Suppression of binocular vision;

n.    Amblyopia suspect, left eye;

o.    Generalized contraction of visual field, bilateral; and

p.    Convergence insufficiency.

160.    As to the Bath Defendants, their conduct was negligent because:

**a.**    The Bath Defendants stood in loco parentis as to PH and owed her the obligation to protect her from the unreasonable risk of injury posed by LD, Jr. and/or other students;

**b.**    They had a duty to PH to protect him from the conduct of LD, Jr. that said Defendants knew or should have known was likely to occur;

c.    They had a duty to Plaintiffs to immediately notify PH's parents/guardians and relay what happened so that they could make informed decisions concerning the care, custody, control and medical care of PH;

d.    They had a duty to PH to educate the staff regarding a concussion protocol;

**e.**    It was foreseeable that, if LD, Jr. cause great bodily harm to others, additional students would suffer great harm;

**f.**    LD, Jr. caused great physical and emotional harm to PH; and

**g.**    The negligent of the Bath Defendants was a proximate cause of the injuries and damages to PH.

161.    To the extent that the court ultimately determines that this case requires application of principles of governmental immunity under the statutes an case law of this state and finds that the fats of this case fail to meet the definition of gross negligence and the proximate cause as determined by the Supreme Court, the requirement that a plaintiff establish a higher standard for proximate cause and establish gross negligence in a case involving governmental actors than would be required for the same plaintiff, on the same facts, in a case against non-governmental defendants, is unconstitutional in that:

    a.    It denies the Plaintiffs in this case due process;

    b.    It denies the Plaintiff in this case the equal protection of the law.

162.    The Bath Defendants were grossly negligent within the meaning of Michigan law in that, for the reasons set forth in the foregoing allegations of the complaint, Defendants' acts and/or inaction constituted conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

163.    The gross negligence of the Bath Defendants was a proximate cause of the injuries and damages to PH.

164.    As a direct and proximate result of the damages to their daughter and constitutional violations described herein, Plaintiffs JACKIE HAGERTY and PATRICK HURST have suffered and will continue to suffer losses into the future, due to the injuries and damages suffered by their Plaintiff child, including, but not limited to:

    a.    The reasonable expense of necessary medical care, treatment and services received by their child;

    b.    The reasonable value of the society, companionship and relationship with their child of which they have been deprived; and

    c.    All other damages that may be learned through the course of discovery.

**COUNT VI**

## Negligent Infliction of Emotional Distress
### *(The Bath Defendants)*

165.    Plaintiffs incorporate by reference all of the previous and subsequent paragraphs.

166.    The Bath Defendants negligently and grossly negligently inflicted emotional

distress upon all individual Plaintiffs in that:

       a.    The injuries inflicted on PH, were serious and of a nature certain to cause severe mental disturbance to these Plaintiffs; and

       b.    The mental shock resulted in actual physical harm to these Plaintiffs.

167.    The negligence of these Defendants was the proximate cause of the injuries and

damages to Plaintiffs.

**WHEREFORE,** the Plaintiffs, PH, by her next friend JACKIE HAGERTY and JACKIE

HAGERTY and PATRICK HURST, individually, claim judgment against the Bath Defendants

in an amount to which they are found to be entitled, together with interest, costs, attorneys fees

and exemplary damages.

## COUNT VII
### Assault and Negligence
### *(The Dillon Defendants)*

168.    Plaintiffs incorporate by reference all of the previous and subsequent paragraphs.

169.    The actions of LD, Jr. as set forth in the common allegations of this complaint

constituted an assault upon PH.

170.    As a direct and proximate result of the actions of the Defendants, PH suffered

shock, humiliation, fright, excruciating pain, suffering and fear.

171.    As a direct and proximate result of the acts of Defendant LD, Jr., PH suffered severe

emotional distress, pain, physical suffering, sleep disturbance, nightmares, fear of attending

school, inability to enjoy activities with peers, and can be expected to continue to suffer such damages into the undetermined future.

172.    As a direct and proximate result of the damages to their daughter, Plaintiffs JACKIE HAGERTY and PATRICK HURST have suffered and will continue to suffer losses into the future due to the injuries and damages suffered by their Plaintiff daughter, including, but not limited to:

  a.  The reasonable expense of necessary medical care, treatment and services received by their children;

  b.  The reasonable value of the society, companionship and relationship with their children of which they have been deprived; and

  c.  All other damages that may be learned though the course of discovery.

## COUNT IX
### Intentional Infliction of Emotional Distress
### *(The Dillon Defendants)*

173.    Plaintiffs incorporate by reference all of the previous and subsequent paragraphs.

174.    The willful, malicious, reckless and intentional acts of LD, Jr. constituted an intentional infliction of emotional distress as defined under Michigan law as to tall Plaintiff, because the behavior was outrageous and specifically intended to inflict severe emotional as well as physical harm on the plaintiffs and all others at Bath Middle School on June 4, 2024.

175.    The willful, malicious, reckless and intentional acts of LD, St. and RD constituted an intentional infliction of emotional distress as defined under Michigan law as to tall Plaintiff, because the behavior was outrageous and specifically intended to inflict severe emotional as well as physical harm on PH at Bath Middle School on June 4, 2024.

176.    As a direct and proximate result of the conduct of the Defendants as alleged herein, plaintiff suffered extreme emotional harm with physical manifestations.

## COUNT X

## Negligent Infliction of Emotional Distress
### *(The Miszewski Defendants)*

177.    Plaintiffs incorporate by reference all of the previous and subsequent paragraphs.

178.    The Dillon Defendants, apart from their willful and reckless conduct, negligently inflicted emotional distress upon all individual Plaintiffs in that:

    a.    The injuries inflicted on PH, were serious and of a nature certain to cause severe mental disturbance to these Plaintiffs; and

    b.    The mental shock resulted in actual physical harm to these Plaintiffs.

179.    The negligence of these Defendants was a proximate cause of the injuries and damages to all Plaintiffs.

### **DAMAGES**

180.    As a direct and proximately results of the actions of the Defendants, Plaintiffs have suffered terror, shock, excruciating pain, suffering and fear.

181.    As a direct and proximately results of the actions of the Defendants, Plaintiff PH has suffered the following, including, but not limited to:

    a.    Concussion without loss of consciousness;

    b.    Broken bones;

    c.    Nausea;

    d.    Fatigue;

    e.    Dizziness;

    f.    Forgetfulness;

    g.    Stuttering;

    h.    Insomnia;

    i.    Headache;

    j.    Anxiety/Depression;

      k.      Deficient smooth pursuit of eye movements;

      l.      Fusion with defective stereopsis;

      m.      Suppression of binocular vision;

      n.      Amblyopia suspect, left eye;

      o.      Generalized contraction of visual field, bilateral; and

      p.      Convergence insufficiency.

182.    As a further direct and proximate cause of the actions of the Defendants, Plaintiffs have suffered severe emotional distress, post-traumatic stress disorder, sleep disturbance, nightmares, flashbacks, fear of attending school, and can be expected to continue to suffer such damages into the future.

183.    As a further direct and proximate cause of the actions of the Defendants, Plaintiffs have suffered and will suffer losses into the future due to the injuries and damages she suffered to her mental health, face and body, including, but not limited to the reasonable expenses of necessary medical care and treatment and all other damages that may be learned through the course of discovery.

WHEREFORE, Plaintiffs claim judgment against the Defendants in the amount to which they are found to be entitled, together with interest, costs, attorneys' fees, exemplary damages, punitive damages and relevant injunctive relief.

Respectfully submitted,

**THE LEX FIRM, P.C.**


____/s/ Andre M. Sokolowski_____
DORA G. HERMIZ SOKOLOWSKI (P59215)
ANDRE M. SOKOLOWSKI (P60737)
Attorneys for Plaintiffs
5840 Lorac Drive, Suite 10
Clarkston, MI   48346
(248) 353-7800
dora@thelexfirm.com
andre@thelexfirm.com

Date:  January 28, 2025




## <u>JURY DEMAND</u>

Plaintiffs, JACKIE HAGERTY, as Next Friend of PAIGE HURST, a minor, JACKIE

HAGERTY and PATRICK HURST, individually, by and through their attorneys, THE LEX

FIRM, P.C, hereby demand Trial by Jury in this matter on all issues so triable.

Respectfully submitted,

**THE LEX FIRM, P.C.**


____/s/ Andre M. Sokolowski_____
DORA G. HERMIZ SOKOLOWSKI (P59215)
ANDRE M. SOKOLOWSKI (P60737)
Attorneys for Plaintiffs
5840 Lorac Drive, Suite 10
Clarkston, MI   48346
(248) 353-7800
dora@thelexfirm.com
andre@thelexfirm.com

Date:  January 28, 2025